**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **THE FEDERAL SAVINGS BANK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 2:22-cv-63-AMM** |
| ) | |
| **STEPHON L. MONTGOMERY,** ) | |
| *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case is before the court on cross motions for summary judgment by plaintiff and counterclaim defendant The Federal Savings Bank ("Federal Savings"), Doc. 62, and defendant and counterclaimant Stephon Montgomery and defendant Helen Irby (collectively, "the defendants"), Doc. 66. Ms. Irby also filed a separate motion for summary judgment, Doc. 65. For the reasons explained below, Federal Savings's motion for summary judgment is **GRANTED** and the defendants' motion for summary judgment is **DENIED**. Ms. Irby's motion for summary judgment is **DENIED AS MOOT**.

## I.     BACKGROUND

The material facts of this case are undisputed. On December 13, 2002, Mr. Montgomery and Ms. Irby, husband and wife, took title to the property located at

959 Diane Street in Leeds, Alabama ("the Property").[1] Doc. 63 ¶¶ 1–2 (citing Doc. 60-1 at 2, Dep. 5:6–13; *id.* at 36–38).

From June 3, 2017 to February 14, 2018, the Property was encumbered by a mortgage loan in favor of BBMC Mortgage in the amount of $291,127. *Id.* ¶ 3 (citing Doc. 60-1 at 3–4, Dep. 9:1–10:9; *id.* at 39–53). "[Mr.] Montgomery was the only obligor on the promissory note." *Id.* ¶ 4 (citing Doc. 60-4 at 2, Dep. 4:22–5:5; *id.* at 3, Dep. 6:4–6; Doc. 60-3 at 3, Dep. 6:3–8:12; *id.* at 10–12). At some point before January 26, 2018, "[Mr.] Montgomery began working with [Federal Savings] on a mortgage loan to replace the [BBMC] loan." *Id.* ¶ 5 (citing Doc. 60-1 at 4, Dep. 11:12–23; *id.*, Dep. 13:4–23; *id.* at 54–58).

On January 26, 2018, Mr. Montgomery entered into a loan agreement with Federal Savings using BCHH, Inc. ("BCHH"), "a company that acts as a closing agent for mortgage loans." *Id.* ¶ 6 (citing Doc. 60-1 at 5, Dep. 15:5–16:16; *id.* at 59–65; Doc. 60-2 at 1–5; Doc. 60-5 at 3, Dep. 9:2–9; *id.* at 4, Dep. 10:17–11:4). "[Ms.] Irby signed the mortgage to [Federal Savings] as a mortgagor, but [Mr.] Montgomery was the only obligor on the promissory note." *Id.* ¶ 7 (citing Doc. 60-1 at 5, Dep. 15:5–16:16; *id.* at 59–65; Doc. 60-2 at 1–5).

Federal Savings did not provide funds to BCHH on January 26, 2018, because

---

[1] At the time Mr. Montgomery and Ms. Irby took title to the house, the address was 1909 Diane Street. Doc. 60-1 at 3, Dep. 6:8–17.

under federal law "[Mr.] Montgomery had three business days following the closing in which to cancel the loan." *Id.* ¶ 8 (citing Doc. 60-5 at 4–5, Dep. 13:1–15:6). Federal Savings gave Mr. Montgomery "written notice of his right to cancel the loan" on January 26. *Id.* ¶ 9 (citing Doc. 60-1 at 5–6, Dep. 16:21–18:6; Doc. 60-2 at 6–7; Doc. 60-5 at 4, Dep. 13:1–12). On January 29, 2018, Mr. Montgomery emailed Chase Kimsey, Mr. Montgomery's loan officer at Federal Savings, to cancel the Federal Savings loan. *Id.* ¶ 10 (citing Doc. 60-1 at 6, Dep. 18:11–19:4; Doc. 60-2 at 8–9).

Mr. Kimsey stated that he did not remember receiving the email, and "therefore[] two things that should not have happened did happen." *Id.* ¶ 11 (citing Doc. 60-6 at 1–7). First, Federal Savings "funded the loan . . . [and] BCHH wired $289,939.28 of the [Federal Savings] loan proceeds to . . . pay off the [BBMC] loan." *Id.* ¶ 12 (citing Doc. 60-5 at 5–6, Dep. 17:14–19:10; *id.* at 28–29). Therefore, BBMC "released its mortgage lien on the Property." *Id.* (citing Doc. 60-7 at 1; Doc. 60-3 at 3, Dep. 8:20–9:18; *id.* at 25). Second, "because [Federal Savings] was unaware that there was, in fact, no loan to sell, [Federal Savings] purported to sell the loan to an investor called The Money Source." *Id.* ¶ 14 (citing Doc. 60-8 at 1, 4).

On February 6, 2018, Federal Savings notified Mr. Montgomery "that his [Federal Savings] loan had been sold to The Money Source and g[ave] him the address to which his future loan payments to The Money Source should be sent." *Id.*

¶ 18 (citing Doc. 60-1 at 7, Dep. 22:1–12; *id.*, Dep. 23:8–25:14; Doc. 60-2 at 10–11, 55–56). According to Federal Savings, "[a]fter receiving [Federal Savings's] February 6, 2018 notice, [Mr.] Montgomery did not contact [Federal Savings] to inform [Federal Savings] that a mistake had been made." *Id.* ¶ 19 (citing Doc. 60-1 at 7, Dep. 25:19–24; *id.* at 8, Dep. 28:10–15).

"On March 20, 2018, The Money Source informed [Federal Savings] that [Mr.] Montgomery, who had made no payments to The Money Source, had just asserted to The Money Source that, on January 29, he had sent his [Federal Savings] loan officer notice that he was cancelling his loan." *Id.* ¶ 20 (Doc. 60-1 at 6, Dep. 21:2–20; Doc. 60-8 at 2, 5–9). Federal Savings "investigated and determined that, in fact, [Mr.] Montgomery had sent [Mr.] Kimsey an e-mail on January 29, 2018 cancelling his loan." *Id.* ¶ 21 (citing Doc. 60-6 at 1–7).

"After learning that [Mr.] Montgomery had cancelled the loan, [Federal Savings] made efforts in March of 2018 to get [BBMC] to refund the money to [Federal Savings]." *Id.* ¶ 23 (citing Doc. 60-5 at 6–7, Dep. 21:11–23:6). "But by that time, [BBMC] had released its mortgage lien on the Property, and [Federal Savings's] request to get its money back was refused." *Id.* (citing Doc. 60-3 at 3–4, Dep. 8:20–9:18; *id.* at 25; Doc. 60-5 at 6–7, Dep. 21:11–23:6). Further, because Mr. Montgomery cancelled the Federal Savings loan, Federal Savings "also released its mortgage lien on the Property." *Id.* ¶ 24 (citing Doc. 60-9).

4

"On May 1, 2018, [Federal Savings] notified [Mr.] Montgomery by letter from an attorney that, pursuant to his cancellation notice to [Federal Savings], [Federal Savings] had canceled his loan." *Id.* ¶ 25 (citing Doc. 60-1 at 8–9, Dep. 29:21–30:22; Doc. 60-2 at 13–14, 57–58). In that letter, Federal Savings "demanded that [Mr.] Montgomery return the amount that [Federal Savings] had paid to the prior lender, but no reimbursement has been made." *Id.* ¶ 26 (citing Doc. 60-1 at 8–9, Dep. 29:21–32:10; Doc. 60-2 at 13–14, 23–24). Federal Savings refunded the loan amount to The Money Source plus "an additional amount pursuant to a formula in the contract between The Money Source and TFSB." *Id.* ¶ 27 (citing Doc. 60-8 at 2–3, 10).

As a result of these actions, "[Mr.] Montgomery was relieved of his $289,939.28 debt to [BBMC] and [Mr.] Montgomery and [Ms.] Irby got title to their house free and clear of any mortgage lien and . . . [Federal Savings] is out the $289,939.28 it paid to [BBMC]." *Id.* ¶ 28 (citing Doc. 60-3 at 3–4, Dep. 8:20–9:18; *id.* at 25; Doc. 60-9; Doc. 60-5 at 6, Dep. 19:6–10).

"On November 8, 2021, [Mr.] Montgomery and [Ms.] Irby entered into a divorce settlement agreement pursuant to which [Ms.] Irby was obligated to convey her interest in the home at 959 Diane St[reet] to [Mr.] Montgomery," *id.* ¶ 29 (citing Doc. 60-1 at 14, Dep. 50:19–23; Doc. 60-2 at 59–65), which she did on May 17, 2022, *id.* ¶ 30 (citing Doc. 60-1 at 14, Dep. 51:22–52:12; Doc. 60-2 at 66–71).

5

On January 18, 2022, Federal Savings filed a complaint against Mr. Montgomery and Ms. Irby. Doc. 1. Federal Savings filed an amended complaint on March 29, 2022, Doc. 8, and a second amended complaint (the "operative complaint") on July 8, 2022, Doc. 36. In the operative complaint, Federal Savings asserted claims for violation of the Truth in Lending Act, 15 U.S.C. § 1635 ("the Act"), and for unjust enrichment. Doc. 36 at 3–7. Mr. Montgomery, *pro se*, filed a counterclaim. Doc. 11 at 17–19.

The exact nature of the counterclaim is unclear. Mr. Montgomery alleges that he "received numerous false requests for money from The Money Source, the business [Federal Savings] wrongfully sold the Defendants['] mortgage to." *Id.* at 8. Mr. Montgomery alleges that he has "had to seek legal assistance and paid an attorney." *Id.* Mr. Montgomery further alleges that Federal Savings has damaged his credit, cut off his ability to refinance his home over the last four years, and blocked his ability to sell his home. *Id.* at 17. Mr. Montgomery alleges that he has "not been able to gain additional equity . . . over the last 4 years." *Id.* at 18. And Mr. Montgomery says that this "uncertainty" has led to "depression . . . anger . . . loss of satisfaction in life as a married couple . . . pursuit of happiness loss . . . loss of control and ownership as a homeowner . . . and also divorce." *Id.*

Federal Savings filed a motion for summary judgment, Doc. 62, supporting evidentiary material, Doc. 60, and a supporting brief, Doc. 63. Ms. Irby filed a

6

"Request for Summary Judgment To Be Dismissed from [the] Lawsuit." Doc. 65. Mr. Montgomery filed a cross-motion for summary judgment, Doc. 66, and supporting evidence, Doc. 67. Mr. Montgomery filed a response in opposition to Federal Savings's motion for summary judgment. Doc. 70. Federal Savings replied, Doc. 71, and filed responses in opposition to Ms. Irby's motion for summary judgment, Doc. 72, and the defendants' cross-motion for summary judgment, Doc. 73.

## II.   LEGAL STANDARD

When evaluating cross-motions for summary judgment, a court must view the facts "in the light most favorable to the non-moving party on each motion." *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012). A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up). In deciding a motion for summary judgment, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

Additionally, "*[p]ro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). Nonetheless, courts require pro se litigants "to conform to procedural rules." *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (cleaned up).

## III.   ANALYSIS

### A.   Federal Savings's Motion for Summary Judgment

#### 1.   Count I – Violation of the Act

Federal Savings argues that it is entitled to summary judgment on Count I based on Mr. Montgomery's purported violation of the Act. *See* Doc. 63 at 16–20. Specifically, Federal Savings contends that the Act requires Mr. Montgomery to repay the loan amount to Federal Savings that Federal Savings paid to BBMC. *See id.* at 19. Mr. Montgomery responds that he timely cancelled the loan with Federal Savings, he has done nothing wrong, and that Federal Savings is proceeding with unclean hands. *See* Doc. 70 at 2–3, 9. Federal Savings replies that even if it violated the Act, it is still entitled to be returned to the *status quo ante*. *See* Doc. 73 at 24.

Subsection (a) of the Act provides that the obligor (*i.e.*, the borrower) has three business days following a transaction in which a security interest is to be

acquired in the obligor's dwelling to rescind the transaction. 15 U.S.C. § 1635(a). To rescind the transaction, the obligor need only "notify[] the creditor . . . of his intention to do so." *Id.* In this case, both parties agree that Mr. Montgomery entered into the loan agreement with Federal Savings on January 26, 2018, and he timely cancelled the loan on January 29, 2018. *See* Doc. 63 ¶¶ 6, 10; Doc. 70 at 2.

Subsection (b) pertains to the "[r]eturn of money or property following recission" under the Act. 15 U.S.C. § 1635(b). That subsection provides:

> When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

*Id.*

The Eleventh Circuit has held that "the goal [of Section 1635(b)] should always be to restore the parties to the status quo ante." *Williams v. Homestake Mortg. Co.*, 968 F.2d 1137, 1142 (11th Cir. 1992) (cleaned up). But "rescission must also maintain its vitality as an enforcement tool." *Id.*

Federal Savings contends that "[w]here, as here, a borrower rescinds a loan the proceeds of which have been used to repay a prior indebtedness of the borrower to a different lender, [the Act] requires the borrower to return that amount." Doc. 63 at 17; *see Powers v. Sims & Levin*, 542 F.2d 1216, 1220 (4th Cir. 1976) (holding that Section 1635 "does not relieve [an obligor] of any other obligation or of a duty to proffer full restoration" after a borrower used loan funds to pay existing debts). And Federal Savings argues that "[n]umerous other cases also hold that [the Act] requires a borrower who has rescinded a loan to return the loan proceeds to the lender." Doc. 63 at 18 (citing *Lavis v. Reverse Mortg. Sols., Inc.*, 40 F.4th 181 (4th Cir. 2022); *Fed. Deposit Ins. Corp. v. Hughes Dev. Co.*, 938 F.2d 889, 890 (8th Cir. 1991); *Rudisell v. Fifth Third Bank*, 622 F.2d 243, 254 (6th Cir. 1980); *LaGrone v. Johnson*, 534 F.2d 1360, 1362 (9th Cir. 1976)).

The rule established in those cases is based on text and context of Section 1635(b): when a borrower gives notice of rescission under Section 1635(a), each party must restore the other to the status quo ante. "Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the

creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value." 15 U.S.C. § 1635(b). Additionally, "[section] 1635(b) gives courts flexibility to ensure the parties are returned to their status quo ante[:] '[t]he procedures prescribed by this subsection shall apply except when otherwise ordered by a court.'" *Lavis*, 40 F.4th at 186 (quoting 15 U.S.C. § 1635(b)).

The importance of restoration to the status quo ante holds firm even in cases such as these where the creditor fails to strictly meet its obligations under the law. Section 1635(b) requires that "[w]ithin 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction." Federal Savings did not return money, property, or any other thing of value within twenty days of the notice of cancellation. "But nothing in [section] 1635(b) specifies that if the lender fails to take these actions, it loses its right to the monies it loaned to the borrower." *Lavis*, 40 F.4th at 187.

Indeed, holding that obligors may escape liability due to mistake "would be remarkable." *Id.* On that logic, a simple failure to notice a cancellation "results in a lender losing—lock, stock and barrel—the moneys it loaned. And the borrower would get to keep, with no repayment obligation, those same funds." *Id.* That sort of

result "in some cases, would redistribute tens of thousands of dollars; in other cases, hundreds of thousands. It is hard to imagine that such extraordinary relief, if allowed under [the Act], would not be specified." *Id.*

The undisputed evidence submitted by the parties confirms that Federal Savings's actions were based on a mistake of fact. The defendants speculate based on a fax cover sheet that another person besides Mr. Kimsey must have seen the cancellation email, *see* Doc. 70 at 4, but adduce no evidence of that. "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

In resolving Federal Savings's motion, the court can either fashion an equitable remedy placing the parties as close as possible to the status quo ante, or allow a mistake to grant a windfall in favor of Mr. Montgomery and Ms. Irby and penalize Federal Savings. The text of Section 1635(b) and the caselaw counsel in favor of the equitable remedy. Therefore, Federal Savings's motion for summary judgment as to Count I is **GRANTED**.

### 2.    **Count II – Unjust Enrichment**

Federal Savings argues that it is entitled to summary judgment for its claim of unjust enrichment. *See* Doc. 63 at 20. According to Federal Savings, "[Mr.] Montgomery and [Ms.] Irby have been unjustly enriched in the amount that [Federal

12

Savings] paid to [BBMC] that resulted in [Mr.] Montgomery being relieved of his indebtedness to [BBMC] and [BBMC] releasing its lien on the property that belonged to both defendants." *Id.* at 21. The defendants respond that "[u]njust enrichment does not apply when a party has violated the law or engaged in unethical behavior." Doc. 70 at 12. Federal Savings replies that the defendants point to "no evidence whatsoever" to prove unclean hands. Doc. 71 at 6–7.

"The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006) (cleaned up). "To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Invs., L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011) (cleaned up). The plaintiff must also establish that the defendant "would be 'unjustly' enriched . . . [which] turns on whether [the plaintiff] has acted under a mistake of fact or in misreliance on a right or duty." *Pentagon Fed. Credit Union v. McMahan*, 343 So. 3d 485, 488 (Ala. 2021).

Those conditions are satisfied here. First, Federal Savings has established that the defendants knowingly hold a benefit—a paid-off loan balance to BMCC. That benefit was provided to the defendants because Federal Savings paid the BMCC loan

13

balance. And Federal Savings had a reasonable expectation of compensation, which was the contemplated loan with the defendants. And Federal Savings has provided uncontroverted evidence that the enrichment is unjust. But for the mistake, it would not have funded the loan to BMCC. *See*, *e.g.*, Doc. 60-6 at 1. On the other hand, there is no evidence that Federal Savings acted with unclean hands.

Accordingly, Federal Savings's motion for summary judgment on Count II is **GRANTED**.

### 3.    Mr. Montgomery's Counterclaim

Federal Savings also moves for summary judgment on Mr. Montgomery's counterclaim. Doc. 63 at 23–26. It argues that the "counterclaim does not contain any information about the legal theory upon which it is premised, but it appears to be attempting to state a claim premised on the Fair Debt Collection Practices Act [(the 'FDCPA')], 15 U.S.C. § 1692, *et seq.*" *Id.* at 24. Federal Savings contends that it cannot be held liable under the FDCPA because "all of the collection efforts were undertaken by The Money Source, and that no such efforts were ever undertaken by [Federal Savings]." *Id.* at 25 (cleaned up).

Mr. Montgomery responds that Federal Savings contacted him "several times to try to get us to start paying The Money Source." Doc. 70 at 14. He also alleges that he "provided documentation of false claims by [The Money Source] added to [Mr. Montgomery's] credit reports." *Id.* Mr. Montgomery alleges that he sent a

14

notice around September 3, 2019, to Federal Savings's counsel Zafreen Husain saying that Mr. Montgomery "would like to discuss this matter with [Mr. Husain] and get a status of the cancellation because a mortgage delinquency has been reported on [his] credit report by The Money Source." *Id.* (cleaned up).

Federal Savings replies that even if Mr. Montgomery's alleged facts were supported by evidence, they "would make no difference to the outcome." Doc. 71 at 10. That is the case because, according to Federal Savings, "all of the collection efforts of which [Mr.] Montgomery complains were undertaken by The Money Source, and . . . none were undertaken by [Federal Savings]." *Id.*

Federal Savings is entitled to summary judgment. If the court treats Mr. Montgomery's counterclaim as a FDCPA claim—and that appears to be the only way to construe it—then that claim fails on its face. "[T]o prevail on an FDCPA claim, a plaintiff must prove [among other things, that] . . . the defendant is a debt collector as defined by the FDCPA . . . ." *Janke v. Wells Fargo & Co.*, 805 F. Supp. 2d 1278, 1281 (M.D. Ala. 2011); *see also Harris v. Liberty Cmty. Mgmt., Inc.*, 702 F.3d 1298, 1302 (11th Cir. 2012) ("The Act's restrictions apply only to 'debt collectors' . . . ."). The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due

another." 15 U.S.C. § 1692a(6).

Mr. Montgomery does not allege that Federal Savings is a debt collector under the FDCPA, and there is no evidence that Federal Savings is a debt collector under the law. Mr. Montgomery does not identify any other evidence that would produce a genuine dispute of material fact as to the outcome of the counterclaim. Therefore, Federal Savings's motion for summary judgment on the counterclaim is **GRANTED**.

### B.    Mr. Montgomery's Cross-Motion for Summary Judgment

Mr. Montgomery moved for summary judgment on all claims. Doc. 66. His motion for summary judgment on Federal Savings's claim under the Act is **DENIED**. As explained above, Federal Savings has established that it is entitled under the Act to be returned to the status quo ante. *See supra* Section III.A.1.

Mr. Montgomery's motion for summary judgment on Federal Savings's unjust-enrichment claim is **DENIED**. As explained above, Federal Savings has demonstrated that there is no genuine dispute of material fact that it is entitled to an equitable remedy. *See supra* Section III.A.2.

Mr. Montgomery's motion for summary judgment on his counterclaim is **DENIED**. As explained above, he cannot prevail under the FDCPA because he has produced no evidence that Federal Savings is a "debt collector" under the law. *See supra* Section III.A.3.

16

### C.    The Remedy

Federal Savings offers two possible remedies: (1) a money judgment in its favor in the amount of $289,929.28; or (2) equitable subrogation—that is, "to declare the prior note and mortgage to be still in existence with [Federal Savings] subrogated to the rights of the prior lender under that loan." Doc. 63 at 21–22. Federal Savings argues that the latter remedy is appropriate here. *Id.* at 22. Federal Savings asserts that Alabama courts have endorsed and applied their proposed remedy of equitable subrogation. *See*, *e.g.*, *Ex parte AmSouth Mortg. Co.*, 679 So. 2d 251, 256 (Ala. 1996) (holding that negligence did not bar equitable subrogation); *Foster v. Porter Bridge Loan Co.*, 27 So. 3d 481, 488 (Ala. 2009) (affirming a trial court's application of equitable subrogation).

The court declines to apply equitable subrogation in this case for two reasons. First, it seems plainly *in*equitable to place the defendants in a mortgage agreement that they validly cancelled under federal law. By allowing Federal Savings to simply take BBMC's position as a mortgage lender, the court would nullify the defendants' undisputed cancellation of the mortgage agreement with Federal Savings.

Second, *Foster* supports the notion that equitable subrogation is not warranted here. In that case, the defendant relied on two affidavits stating that a judgment lien did not exist against a borrower when, in fact, one did. 27 So. 3d at 483. The Alabama Supreme Court held that the plaintiff failed to show that the defendant "had

such knowledge in its possession that would have invited diligent inquiry that would result in actual knowledge." *Id.* at 488. Unlike *Foster*, it is undisputed that Federal Savings had possession of Mr. Montgomery's cancellation of the loan.

Accordingly, the court awards Federal Savings a money judgment in the amount of $289,939.28—the amount Federal Savings paid to BBMC. Doc. 63 ¶ 12. That judgment is against Mr. Montgomery only, because he was the sole obligor of the original promissory note. *Id.* ¶ 4.

### D.   Ms. Irby's Motion for Summary Judgment

In her separate motion for summary judgment, Ms. Irby "request[s] to be dismissed from the lawsuit." Doc. 65 at 1. The court has determined that Federal Savings is entitled to judgment on each of its claims, but it cannot collect that judgment against Ms. Irby, and the court has entered judgment on that ground. Therefore, her motion is **DENIED AS MOOT**.

## IV.   CONCLUSION

The court **GRANTS** Federal Savings's motion for summary judgment and **DENIES** Mr. Montgomery's cross-motion for summary judgment. Ms. Irby's motion for summary judgment is **DENIED AS MOOT**. The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 5th day of March, 2024.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE